<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

```
RAFIEEK SALAAM GRAHAM,          :
                                :  Civil Action No. 10-2010 (KSH)
                Plaintiff,      :
                                :
                                :
          v.                    :  OPINION
                                :
CHRIS CHRISTIE, et al.,         :
                                :
                Defendants.     :
```

**APPEARANCES:**

> RAFIEEK SALAAM GRAHAM, Plaintiff <u>pro</u> <u>se</u>
> #083 South House
> Special Treatment Unit
> CN-905, P.O. Box 190
> Avenel, New Jersey 07001

**HAYDEN**, District Judge

Plaintiff, Rafieek Salaam Graham, an involuntarily committed person pursuant to the Sexually Violent Predator Act ("SVPA"), <u>N.J.S.A.</u> 30:4-27.24, <u>et</u> <u>seq.</u>, seeks to bring this action <u>in</u> <u>forma</u> <u>pauperis</u>. Based on his affidavit of indigence, the Court will grant plaintiff's application to proceed <u>in</u> <u>forma</u> <u>pauperis</u> ("IFP") pursuant to 28 U.S.C. § 1915(a) (1998) and order the Clerk of the Court to file the Complaint.

At this time, the Court must review the Complaint,[1] pursuant to 28 U.S.C. § 1915(e)(2), to determine whether it should be

---

[1] Plaintiff filed an addendum to his Complaint on or about May 4, 2010. <u>See</u> Docket entry no. 2. He filed a second addendum on June 9, 2010. <u>See</u> Docket entry no. 4.

dismissed as frivolous or malicious, for failure to state a claim upon which relief may be granted, or because it seeks monetary relief from a defendant who is immune from such relief.  For the reasons set forth below, the Court concludes that the Complaint should be dismissed without prejudice at this time.

## I.   BACKGROUND

Plaintiff, Rafieek Salaam Graham ("Graham"), brings this civil rights action, pursuant to 42 U.S.C. § 1983, against the following defendants: Chris Christie, the Governor of New Jersey; Paula Dow, Attorney General for the State of New Jersey; Gary Lanigan, Commissioner of the New Jersey Department of Corrections ("NJDOC"); Jennifer Velez, Commissioner of the New Jersey Department of Human Services ("NJDHS"); Steven Johnson, NJDOC Administrator; and Merril Main, NJDHS Administrator.  (Complaint, Caption and ¶¶ 4b-4g).  The following factual allegations are taken from the Complaint, and are accepted for purposes of this screening only.  The Court has made no findings as to the veracity of plaintiff's allegations.

Graham alleges that, on March 17, 2010, a community meeting was held at the Northern Regional Unit ("NRU") in Kearny, New Jersey to discuss a proposed transfer of the NRU residents to the East Jersey State Prison ("EJSP") in Rahway, New Jersey.[2]  The

---

[2]  The transfer of the NRU residents at the Kearny facility has been the subject of newspaper articles and a recent application for injunctive relief in a pending civil case in this

meeting was conducted by defendant Steven Johnson.  Johnson told the residents that they would be housed in the administrative segregation unit at the EJSP.  He also told the residents that they would have to take their mattresses with them.  (Compl., ¶ 6 Statement of Claims).

On March 25, 2010, a memorandum was issued informing the residents that they can not order personal belongings, such as food and clothing, or pay bills because of the pending transfer to EJSP.  There also was a deadline of April 9, 2010, for

---

District Court, Alves, et al. v. Ferguson, et al., Civil Action No. 01-cv-0789 (DMC)(MF)(Consolidated).  This Court refers to the Opinion issued by the Honorable Dennis M. Cavanaugh, U.S.D.J., in the Alves case, on March 29, 2010, in which Judge Cavanaugh denied injunctive relief.  (See Docket entry no. 115).  In Alves, the residents moved to have the Court order that (a) the resident population at the Annex (another NJDOC facility in New Jersey) not be increased without leave of Court; and (b) the State of New Jersey must provide residents' counsel with at least 30 days notice of any proposed transfer to allow the residents an opportunity to seek Court intervention, if necessary. Specifically, for purposes of factual background in this action, Judge Cavanaugh noted that, "[p]ursuant to County of Hudson v. State of New Jersey, the State of New Jersey is required to turn over the premises of the [Kearny] facility to the County of Hudson by May 19, 2010.  See 2009 N.J. Super Unpub. LEXIS 1188, at *19 (N.J. Super. A.D.).  Accordingly, the State must locate another temporary or permanent facility to house the SVPs currently living there."  (March 29, 2010 Opinion, Docket entry No. 115, at pg. 2).  Judge Cavanaugh further noted that a February 3, 2010 newspaper article had reported that the residents of the Kearny facility were to be relocated to the Special Treatment Unit "Annex" in Avenel, New Jersey, located on or near the grounds of the East Jersey State Prison.  However, by the time the briefing on the residents' motion was completed, it had been confirmed that another location had been selected, namely, the administrative segregation unit in East Jersey State Prison itself.  (March 29, 2010 Opinion, Docket entry No. 115, at pg. 4).

3

receiving general packages, and a deadline of April 25, 2010 for receiving food packages at the Kearny facility.  (<u>Id</u>.).

On April 8, 2010, during group therapy at the Kearny facility, the therapists told plaintiff that there would be no group therapy or visits for a month at EJSP.  (<u>Id</u>.).

On May 4, 2010, this Court received an addendum to the Complaint filed by Graham.  (Docket entry no. 2).  The addendum states that, on April 26, 2010, Graham attended his group (substance abuse) meeting, and was informed by Mr. Whalen that the EJSP administrative segregation unit has a "scent of a sewer drain" and residents will not be able to take showers until after 7:00 p.m.  (<u>Id</u>., at pg. 1).  Plaintiff also was told that there is no kitchen setting, no rooms for therapy, no air circulation, and that much work had to be done to the building.  Later that day, a NJDOC Administrator Steven Johnson told some residents that they were trying to get an extension for the transfer because the unit at  EJSP was not ready to house civilly committed residents.  Johnson also stated that the move to EJSP would still occur, and that the residents would be under the supervision of the EJSP correctional officers with an "elite force of correction officers (S.O.G.) with dogs to correct complaints."  (<u>Id</u>.).

On April 28, 2010, a memo was issued to the residents informing them that their new mailing address would be the Avenel

facility and not EJSP in Rahway, New Jersey where the residents were to be housed.  (Id., pp. 1-2).

On June 9, 2010, Graham filed an another addendum to his Complaint.  (Docket entry no. 4).  He states that on May 6, 2010, Johnson walked through the 2-South Unit at Kearny and told the residents that NJDHS and NJDOC officials "know that our (residents) rights are being violated - but as of now, their only concern is getting [the residents] housed on the East Jersey State Prison Ad-Seg Unit, and they (Administrators of D.H.S. and D.O.C.) Will deal with problems as they come."  (Docket entry no. 4-1, at pg. 1).

The next day, on May 7, 2010, plastic bags were issued to plaintiff for transfer of his bed linens.  Graham was told that the S.O.G. (Special Organized Group) would be on stand-by to correct any problems concerning the living conditions at EJSP. Graham states that he was informed later that day that the water at EJSP was not safe to drink, yet the residents were expected to drink, shower and cook with the water.  He complained to Sgt. Smith at the Kearny facility and was told that a water inspector was going to re-check the water system for metal and bacteria levels.  (Id.).

Sgt. Smith also told plaintiff that the building at EJSP has bad air circulation, and that when it's hot outside, it is hotter

inside.  Graham states that this condition of confinement violates the Eighth Amendment.  (Id., at pg. 2).

Graham arrived at the EJSP on May 12, 2010, and was placed on the third level tier, gated in, with no phones and cold showers.  There was no treatment staff there at any time during this move from Kearny to EJSP.  Graham states that he had to walk to the Rahway Camp (Annex) to eat, and was given only ten minutes to eat before having to return to his unit at EJSP.  (Id.)

Graham did not receive his mattress or bedding when he arrived on May 12th, and did not get them until 10:30 p.m. that night.  On May 13, 2010, Graham had to walk from the EJSP "Ad-Seg Unit" to the Annex building (Rahway Camp) for breakfast.  He had only 15 minutes to eat and clear the mess hall without any time for washing up.  He alleges that there has been no treatment since his arrival at EJSP, and his mailing address is at the STU in Avenel and not EJSP where he is confined, so his mail and packages are sent to another place requiring an officer to go to Avenel and pick the mail up.  (Id., pp. 3, 4).

On May 17, 2010, five days after his move to EJSP, Graham went to a group therapy session and attempted to participate.  However, Graham states that he could not focus because of his situation being confined at EJSP, and was thrown out until he would apologize.  Graham complains that Dr. Gonzalez and Dr. Vega did not allow plaintiff to explain the mental stress he was feeling from being confined in a prison setting.  It appears that

plaintiff may have been warned that his failure to cooperate would result in his placement in Modified Activity Program ("MAP"), which is even more restrictive than his confinement at EJSP in general.  (Id., pp. 4, 5).

On May 18, 2010, Graham alleges that it had rained all day and the ceiling leaked.  He states that there was a white foam substance streaming across the place where the water was falling. He further alleges that, on May 19, 2010, he observed the NJDHS staff (psychiatrists, psychologists, social workers, etc.) moving office supplies off the EJSP compound to a location in Edison, New Jersey, purportedly leaving the residents with no on-site doctor to contact.  (Id., pg. 6).

On May 27, 2010, Graham alleges that he was pat-searched and finger-scanned (an "Ion search") as he was coming in from the yard.  When Graham complained that he was a civilly committed person and not a prisoner, he was told that he is in a prison. (Compl., pg. 7).

In his Complaint, Graham asserts that, as a civilly committed person, he should not be housed in a prison facility. He further alleges that he will be housed in the administrative segregation unit, which is a 23-hour lock-down unit.  Graham asserts that this transfer is a violation of his constitutional rights.  He complains that the loss of therapy and visitation for a month, and the interference with his mail violate his constitutional rights.  (Compl., ¶ 6).

Graham asks that he be provided with "the proper treatment of a federally funded facility."  He also seeks an unspecified amount in compensatory damages for the mental anguish and stress that he is suffering in being transferred to a prison facility. (Compl., ¶ 7).

## II.  STANDARDS FOR A SUA SPONTE DISMISSAL

A district court is required to review a complaint in a civil action where the litigant is proceeding in forma pauperis. Specifically, the court is required to identify cognizable claims and to sua sponte dismiss any claim that is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief, pursuant to 28 U.S.C. § 1915(e)(2)(B).  Accordingly, because Graham is proceeding in forma pauperis in this matter, this action is subject to sua sponte screening for dismissal under 28 U.S.C. § 1915(e)(2)(B).

In determining the sufficiency of a pro se complaint, the Court must be mindful to construe it liberally in favor of the plaintiff.  See Erickson v. Pardus, 551 U.S. 89, 93-94 (2007)(following Estelle v. Gamble, 429 U.S. 97, 106 (1976) and Haines v. Kerner, 404 U.S. 519, 520-21 (1972)).  See also United States v. Day, 969 F.2d 39, 42 (3d Cir. 1992).  The Court must "accept as true all of the allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff."  Morse v. Lower

8

Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997).  The Court
need not, however, credit a pro se plaintiff's "bald assertions"
or "legal conclusions."  Id.

A complaint is frivolous if it "lacks an arguable basis
either in law or in fact."  Neitzke v. Williams, 490 U.S. 319,
325 (1989) (interpreting the predecessor of § 1915(e)(2), the
former § 1915(d)).  The standard for evaluating whether a
complaint is "frivolous" is an objective one.  Deutsch v. United
States, 67 F.3d 1080, 1086-87 (3d Cir. 1995).

A pro se complaint may be dismissed for failure to state a
claim only if it appears "'beyond doubt that the plaintiff can
prove no set of facts in support of his claim which would entitle
him to relief.'"  Haines, 404 U.S. at 521 (quoting Conley v.
Gibson, 355 U.S. 41, 45-46 (1957)).  See also Erickson, 551 U.S.
at 93-94 (In a pro se prisoner civil rights complaint, the Court
reviewed whether the complaint complied with the pleading
requirements of Rule 8(a)(2)).

However, recently, the Supreme Court revised this standard
for summary dismissal of a Complaint that fails to state a claim
in Ashcroft v. Iqbal, 129 S.Ct. 1937 (2009).  The issue before
the Supreme Court was whether Iqbal's civil rights complaint
adequately alleged defendants' personal involvement in
discriminatory decisions regarding Iqbal's treatment during
detention at the Metropolitan Detention Center which, if true,
violated his constitutional rights.  Id.  The Court examined Rule

9

8(a)(2) of the Federal Rules of Civil Procedure which provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2).[3] Citing its recent opinion in <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007), for the proposition that "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,' "<u>Iqbal</u>, 129 S.Ct. at 1949 (quoting <u>Twombly</u>, 550 U.S. at 555), the Supreme Court identified two working principles underlying the failure to state a claim standard:

> First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice ... . Rule 8 ... does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not "show[n]"-"that the pleader is entitled to relief." <u>Fed. Rule Civ. Proc.</u> 8(a)(2).

<u>Iqbal</u>, 129 S.Ct. at 1949-1950 (citations omitted).

The Court further explained that

> a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a

---

[3]   Rule 8(d)(1) provides that "[e]ach allegation must be simple, concise, and direct. No technical form is required." Fed.R.Civ.P. 8(d).

> complaint, they must be supported by factual allegations.
> When there are well-pleaded factual allegations, a court
> should assume their veracity and then determine whether they
> plausibly give rise to an entitlement to relief.

Iqbal, 129 S.Ct. at 1950.

Thus, to prevent a summary dismissal, civil complaints must now allege "sufficient factual matter" to show that a claim is facially plausible.  This then "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. at 1948.  The Supreme Court's ruling in Iqbal emphasizes that a plaintiff must demonstrate that the allegations of his complaint are plausible.  Id. at 1949-50; see also Twombly, 505 U.S. at 555, & n.3; Fowler v. UPMC Shadyside, 578 F.3d 203, 210(3d Cir. 2009).

Consequently, the Third Circuit observed that Iqbal provides the "final nail-in-the-coffin for the 'no set of facts' standard" set forth in Conley v. Gibson, 355 U.S. 41, 45-46 (1957),[4] that applied to federal complaints before Twombly.  Fowler, 578 F.3d at 210.  The Third Circuit now requires that a district court must conduct the two-part analysis set forth in Iqbal when presented with a motion to dismiss:

─────────────

[4]  In Conley, as stated above, a district court was permitted to summarily dismiss a complaint for failure to state a claim only if "it appear[ed] beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.  Id., 355 U.S. at 45-46.  Under this "no set of facts" standard, a complaint could effectively survive a motion to dismiss so long as it contained a bare recitation of the claim's legal elements.

First, the factual and legal elements of a claim should be
separated.  The District Court must accept all of the
complaint's well-pleaded facts as true, but may disregard
any legal conclusions. [Iqbal, 129 S.Ct. at 1949-50].
Second, a District Court must then determine whether the
facts alleged in the complaint are sufficient to show that
the plaintiff has a "plausible claim for relief." [Id.]  In
other words, a complaint must do more than allege the
plaintiff's entitlement to relief.  A complaint has to
"show" such an entitlement with its facts.  See Phillips,
515 F.3d at 234-35.  As the Supreme Court instructed in
Iqbal, "[w]here the well-pleaded facts do not permit the
court to infer more than the mere possibility of misconduct,
the complaint has alleged-but it has not 'show [n]'-'that
the pleader is entitled to relief.'"  Iqbal, [129 S.Ct. at
1949-50].  This "plausibility" determination will be "a
context-specific task that requires the reviewing court to
draw on its judicial experience and common sense." Id.

Fowler, 578 F.3d at 210-211.

This Court is mindful, however, that the sufficiency of this

pro se pleading must be construed liberally in favor of

Plaintiff, even after Iqbal.  See Erickson v. Pardus, 551 U.S. 89

(2007).  Moreover, a court should not dismiss a complaint with

prejudice for failure to state a claim without granting leave to

amend, unless it finds bad faith, undue delay, prejudice or

futility. See Grayson v. Mayview State Hosp., 293 F.3d 103, 110-

111 (3d Cir. 2002); Shane v. Fauver, 213 F.3d 113, 117 (3d Cir.

2000).

### III.  SECTION 1983 ACTIONS

Graham brings this action pursuant to 42 U.S.C. § 1983.

Section 1983 provides in relevant part:

Every person who, under color of any statute,
ordinance, regulation, custom, or usage, of any State
or Territory ... subjects, or causes to be subjected,
any citizen of the United States or other person within

12

> the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity, or other
> proper proceeding for redress ... .

Thus, to state a claim for relief under § 1983, a plaintiff must allege, first, the violation of a right secured by the Constitution or laws of the United States and, second, that the alleged deprivation was committed or caused by a person acting under color of state law.  West v. Atkins, 487 U.S. 42, 48 (1988); Piecknick v. Pennsylvania, 36 F.3d 1250, 1255-56 (3d Cir. 1994).

## IV.   THE NEW JERSEY SEXUALLY VIOLENT PREDATOR ACT

The New Jersey SVPA, N.J.S.A. 30:4-27.24 *et seq.*, provides for the custody, care and treatment of involuntarily committed persons who are deemed to be sexually violent predators ("SVP"). N.J.S.A. 30:4-27.26.  The New Jersey Department of Corrections ("DOC") operates the facilities designated for SVPs, N.J.S.A. 30:4-27.34(a); and the New Jersey Department of Human Services ("DHS") provides for their treatment.  N.J.S.A. 30:4-27.34(b). The SVPA was amended in 2003 to require that regulations be promulgated jointly by the DOC and the DHS, in consultation with of the Attorney General, taking "into consideration the rights of the patients as set forth in section ten of P.L. 1965, c. 59 (C. 30:4-24.2) ... [to] specifically address the differing needs and specific characteristics of, and treatment protocols related to, sexually violent predators."  N.J.S.A. 30:4-27.34(d).

In passing the SVPA, the New Jersey Legislature made specific findings regarding SVPs.  N.J.S.A. 30:4-27.25.  The Legislature noted that it was necessary to modify the previous civil commitment framework and additionally separate SVPs from other persons who have been civilly committed.  Id.  The SVPA defines a SVP as:

> ... a person who has been convicted, adjudicated delinquent or found not guilty by reason of insanity for commission of a sexually violent offense, or has been charged with a sexually violent offense but found to be incompetent to stand trial, and suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment.

N.J.S.A. 30:4-27.26(b).

Those persons committed under the SVPA shall receive annual review hearings.  N.J.S.A. 30:4-27.35.  A SVP may be released from involuntary civil commitment upon recommendation of the DHS or by the SVP's own petition for discharge.  N.J.S.A. 30:4-27.36.

V.  ANALYSIS

A.  Transfer to Prison Facility Claim

The principal claim asserted in Graham's Complaint is that his transfer to a prison facility, as a civilly committed person under the SVPA, is unconstitutional.  Graham seeks to prevent his transfer accordingly.

In Kansas v. Hendricks, 521 U.S. 346 (1997), the Supreme Court of the United States examined the conditions of confinement provided by Kansas' Sexually Violent Predator Act.  The Act called for the confinement of sexually violent predators in a

14

secure facility because they were dangerous to the community. Id., 521 U.S. at 363-64. Pertinent here, the Supreme Court was aware that the sexually violent predators in Kansas were to be held in a segregated unit within the prison system. However, the Court noted that the conditions within the unit were essentially the same as conditions for other involuntarily committed persons in mental hospitals. Moreover, confinement under the Act was not necessarily indefinite in duration, and the Act provided for treatment. Id., 521 U.S. at 363, 364, 365-368. Thus, the Supreme Court held that involuntary confinement under Kansas' SVPA was not unconstitutional so long as such civilly-confined persons are segregated from the general prison population and afforded the same status as others who have been civilly committed. Id., 521 U.S. at 368-69. See also Seling v. Young, 531 U.S. 250, 261062 (2001)(holding same with respect to the State of Washington's SVPA).

Here, the New Jersey SVPA is essentially the same as the Kansas and Washington SVP statutes that were examined and upheld as constitutional by the Supreme Court in Hendricks and Seling, respectively.[5] See Bagarozy v. Goodwin, Civil Action No. 08-468

---

[5]  Recently, the Supreme Court held constitutional under the Necessary and Proper Clause, a federal statute that allowed a district court to order the civil commitment of a sexually dangerous federal prisoner beyond the date the prisoner would otherwise be released. United States v. Comstock, No. 08-1224, __ U.S. __, 130 S.Ct. 1949 (May 17, 2010). Although these civilly committed persons remained confined at a federal prison, namely, FCI Butner, the Court did not address their place of civil confinement as being unconstitutional.

(SRC), 2008 WL 4416455, *7-8 (D.N.J. Sept. 23, 2008); In re
Commitment of W.Z., 173 N.J. 109, 801 A.2d 205, 211 (2002).
Therefore, this Court finds that Graham's transfer, with the SVP
residents of the Kearny facility, to a segregated unit in the
East Jersey State Prison does not, in and of itself, violate the
U.S. Constitution's Due Process Clause.  Moreover, because the
transfer has now been effected, plaintiff's claim for injunctive
relief to prevent the transfer to EJSP is now rendered moot.
Accordingly, the claim that plaintiff's transfer to a segregated
unit within a prison facility is unconstitutional will be
dismissed for failure to state a cognizable claim of a
constitutional deprivation.

B.  Conditions of Confinement Claim

    Although plaintiff's transfer to a segregated unit within a
prison facility is not, in and of itself, a constitutional
violation, Graham makes additional allegations concerning the
conditions of confinement at the EJSP facility.  For instance, he
complains that he will be housed in a 23-hour lock-down facility.
However, Graham also states that Mr. Main had told the residents
that there would be a period of time needed to resolve issues of
recreation and yard time, meal supply and dining, and the
renovation of the space to make suitable living quarters for the
civilly committed residents.  See Youngberg v. Romeo, 457 U.S.
307, 321-22 (1982)("Persons who have been involuntarily committed
are entitled to more considerate treatment and conditions of

confinement than criminals whose conditions of confinement are designed to punish."). Moreover, Graham alleges that there is poor air circulation, poor quality drinking water, cold showers, and leaking ceilings.

Generally, the Fourteenth Amendment requires that civilly committed persons not be subjected to conditions that amount to punishment, Bell v. Wolfish, 441 U.S. 520, 536 (1979),[6] within the bounds of professional discretion, Youngberg, 457 U.S. at 321-22. Specifically, in Youngberg, the Supreme Court held that civilly committed persons do have constitutionally protected interests, but that these rights must be balanced against the reasons put forth by the State for restricting their liberties. Id. at 307. The Constitution is not concerned with de minimis restrictions on patients' liberties. Id. at 320. Moreover, "due process requires that the conditions and duration of confinement [for civilly confined persons] bear some reasonable relation to the purpose for which persons are committed." Seling, 531 U.S. at 265. While the nature of an SVP's confinement may factor in this balance of what is reasonable, it is clearly established that the substantive due process protections of the Fourteenth Amendment apply to SVPs. See Andrews v. Neer, 253 F.3d 1052, 1061 (8th Cir.

---

[6] In Bell v. Wolfish, the Supreme Court held that whether a condition of confinement of pretrial detainees violated their constitutional rights turns on whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate government purpose. 441 U.S. 520, 535-39, (1979).

2001)(applying the Fourteenth Amendment's "objective reasonableness" standard to excessive force claims brought by civilly committed SVPs).

Graham's main allegation with respect to the conditions of his confinement relates to his contention that he is now housed in a 23-hour lock down facility.  This restriction also involves limited recreation yard time and having to dine at the Annex (Rahway Camp), which limits time for eating and washing up afterwards.  However, Graham acknowledges in his Complaint that these conditions are merely temporary until the "Ad Seg Unit" is renovated for the SVP residents.  At most, the administrators told plaintiff and the other SVP residents that it would take a month or two to complete renovations to accommodate the less restrictive and treatment-oriented environment suitable for civilly committed SVPs.  This Court further observes from plaintiff's addendum (Docket entry no. 4) that Graham has had yard recreation time since his transfer to EJSP, as well as access to the dining hall at the Annex, which tends to belie the allegation that the residents are subject to a 23-hour lockdown.

Moreover, even if plaintiff has temporary restrictions in yard activity, mobility, and dining facilities, the Third Circuit has held that placement of a civilly committed SVP in segregated confinement does not violate due process unless the deprivation of liberty is in some way extreme.  See Deavers v. Santiago, 243 Fed. Appx. 719, 721 (3d Cir. 2007)(applying Sandin v. Conner, 515

U.S. 472 (1995),[7] to segregated confinement of civilly committed
SVPs). <u>See also</u> <u>Thielman v. Leean</u>, 282 F.3d 478 (7th Cir.
2002)(likewise extending <u>Sandin</u> to civil commitment settings).
As stated above, Graham's complaints about the restrictions on
his confinement are minimal and clearly temporary.  Consequently,
this Court finds that Graham has failed to state a cognizable
claim in this regard at this time

   Graham also alleges unsanitary or unhealthy conditions of
confinement, namely, that there is poor air circulation and water
quality, and that the ceilings leak when it rains.  Certainly,
these conditions bear no reasonable relation to the purpose for
which Graham and the other SVP residents are committed, and to
the extent these uninhabitable living conditions are not
addressed with the renovations, Graham may have a viable
Fourteenth Amendment conditions of confinement claim.

   Nevertheless, this Court is guided by the Third Circuit's
determination in the context of a Fourteenth Amendment claim, as
set forth in <u>Hubbard v. Taylor</u>, 538 F.3d 229 (3d Cir.
2008)("<u>Hubbard II</u>").  In <u>Hubbard II</u>, the Third Circuit held that
requiring pretrial detainees (claims by pretrial detainees, like
civilly committed persons, are governed by the Fourteenth

---

   [7] In <u>Sandin</u>, the Supreme Court held that there was no
cognizable liberty interest in freedom from additional restraint
in a prison setting. <u>See</u> 515 U.S. at 486 ("We hold that [the
prisoner's] discipline in segregated confinement did not present
the type of atypical, significant deprivation in which a State
might conceivably create a liberty interest.").

Amendment) to sleep on a mattress on the floor in a cell holding three inmates for three to seven months did not constitute punishment in violation of the Fourteenth Amendment.  538 F.3d at 234-35.  The court rejected the Second Circuit's per se ban on the practice in Lareau v. Manson, 651 F.2d 96 (2d Cir. 1981), and instead considered it "as part of the 'totality of the circumstances within [the] institution.'"  Hubbard II, 538 F.3d at 235 (quoting Hubbard v. Taylor, 399 F.3d 150, 160 (3d Cir. 2005)("Hubbard I")[8]).  The court then concluded that although the plaintiffs "did spend a substantial amount of time on floor mattresses," they had access to large day rooms and the record did not substantiate plaintiffs' claims that the use of floor mattresses caused disease or led to the splashing of human waste on the plaintiffs. Id.  After noting the efforts made by the jail to improve conditions, the court found "that Plaintiffs were not subjected to genuine privations and hardship over an extended period of time for purposes of their due process claim."  Id.

Based on the allegations in Graham's complaint, many of which were speculative (plaintiff had not yet been transferred to EJSP when he made some of these allegations concerning the poor conditions of confinement) at the time he filed his Complaint,

---

[8]   Hubbard I is the predecessor to Hubbard II.  In Hubbard I, the Third Circuit remanded plaintiffs' case to the district court to apply the correct standard for a conditions of confinement claim by a detainee under the Fourteenth Amendment. 399 F.3d at 166-67.  The district court subsequently ruled in defendants' favor and plaintiffs appealed, resulting in Hubbard II.   538 F.3d at 230.

this Court finds that plaintiff's allegations concerning the "totality of circumstances" surrounding his confinement are not sufficient at this time to suggest that he has been "subjected to genuine privations and hardship over an extended period of time for purposes of [his] due process claim." See Hubbard II, 538 F.3d at 235.   Therefore, the Court will dismiss the conditions of confinement claim, without prejudice, for failure to state a claim at this time.   To the extent that these conditions continue for a longer period of time than suggested by the NJDHS and NJDOC administrators, Graham may seek leave to re-open this case and file an amended pleading.[9]

C.   Interference with the Mail Claim

Graham next appears to assert that the delivery of his mail to the Annex, rather than directly to him at EJSP, violates his First Amendment rights.

---

[9] Should plaintiff so choose to amend his Complaint to cure the deficiencies noted herein, pursuant to Federal Rule of Civil Procedure 15, Graham should note that when an amended complaint is filed, the original complaint no longer performs any function in the case and "cannot be utilized to cure defects in the amended [complaint], unless the relevant portion is specifically incorporated in the new [complaint]." 6 Wright, Miller & Kane, Federal Practice and Procedure § 1476 (2d ed. 1990) (footnotes omitted).   An amended complaint may adopt some or all of the allegations in the original complaint, but the identification of the particular allegations to be adopted must be clear and explicit.   Id.   To avoid confusion, the safer course is to file an amended complaint that is complete in itself.   Id.

Inmates have a limited liberty interest in their mail under the First and Fourteenth Amendments.  Jones v. Brown, 461 F.3d 353, 358 (3d Cir. 2006), cert. denied, 549 U.S. 1286 (2007).[10] However, an inmate's constitutional right to send and receive mail may be restricted for legitimate penological interests.  See Thornburgh v. Abbott, 490 U.S. 401, 407 (1989); Turner v. Safley, 482 U.S. 78, 89 (1987).  In Turner, the Supreme Court of the United States found that a prison regulation infringing on an inmate's constitutional rights is valid so long as it is reasonably related to a legitimate penological interest.  Id. at 89.  The Court established a balancing test pursuant to which courts analyze prohibitions on prisoners' exercise of their constitutional rights by considering the following four factors: (1) whether prohibiting an inmate from exercising a

---

[10]    In Jones v. Brown, the United States Court of Appeals for the Third Circuit held that the legal mail policy of state prison in opening legal mail outside the presence of the inmate violated the inmate's First Amendment right to freedom of speech, and was not reasonably related to prison's legitimate penological interest in protecting health and safety of prisoners and staff. 461 F.3d at 358.  The Third Circuit also has held that "a pattern and practice of opening properly marked incoming court mail outside an inmate's presence infringes communication protected by the right to free speech.  Such a practice chills protected expression and may inhibit the inmate's ability to speak, protest, and complain openly, directly, and without reservation with the court." Bieregu v. Reno, 59 F.3d 1445, 1452 (3d Cir. 1995) (applying the Turner analysis), implied overruling on other grounds recognized in Oliver v. Fauver, 118 F.3d 175, 177-78 (3d Cir. 1997). Thus, the assertion that legal mail is intentionally opened and read, delayed for an inordinate period of time, or stolen may state a First Amendment claim.  See, e.g., Antonelli v. Sheahan, 81 F.3d 1422, 1431-32 (7th Cir. 1996); Castillo v. Cook County Mail Room Dep't, 990 F.2d 304 (7th Cir. 1993).

constitutional right is rationally related to a legitimate governmental interest; (2) whether there are alternative means of exercising that right; (3) what effect accommodation of the interest would have on guards, other inmates, and the allocation of prison resources; and (4) whether there are ready alternatives available that continue to serve the prison's interest without impinging constitutional rights.  Turner, 482 U.S. at 89-91.  The Court also recognized that deference should be given to the decisions of prison administrators, especially when those decisions deal with issues of prison safety and security.  Id.

The Third Circuit has applied Turner in analyzing constitutional claims by civilly committed SVPs.  See Rivera v. Rogers, 224 Fed. Appx. 148, 2007 WL 934413 (3d Cir. March 29, 2007)(applying Turner in analyzing claims of SVPs that opening of their packages violated their First Amendment rights).  Other courts likewise have applied Turner when analyzing claims brought by civilly committed SVPs alleging First Amendment violations.[11] See Willis v. Smith, 2005 WL 550528 (N.D. Iowa Feb. 28, 2005)(noting that status of SVPs was substantially similar to that of prisoners and applying Turner to SVP claims concerning

---

[11]  Essentially, the First Amendment analysis under Turner mirrors the due process analysis under Youngberg; in both instances, courts must balance the constitutional interests of confined persons against the legitimate interests of the state-run institution in which they reside.  See Beaulieu v. Ludeman, 2008 WL 2498241, at *20 n. 15 (finding Turner to be consistent with Youngberg because "it will not allow a Program detainee's right to be restricted unless there is a valid institutional reason for doing so").

mail handling procedures); <u>Ivey v. Mooney</u>, 2008 WL 4527792, at \*4
n. 7 (D. Minn. Sept. 30, 2008)(applying <u>Turner</u>, but noting that a
civil confinement is significantly different from a criminal
confinement); <u>Francis v. Watson</u>, 2006 WL 2716452, at \*3 (D.S.C.
Sept. 22, 2006)(citing cases that have applied <u>Turner</u> in cases
involving civilly confined persons); <u>Marsh v. Liberty Behavioral
Health Care, Inc.</u>, 2008 WL 821623, at \*5 (M.D. Fla. Mar. 27,
2008), <u>aff'd</u> 330 Fed. Appx. 179 (11th Cir. 2009); <u>Beaulieu v.
Ludeman</u>, 2008 WL 2498241, at \*20 (D. Minn. June 18, 2008).

In <u>Rivera</u>, the Third Circuit affirmed the district court's
ruling that a facility housing civilly committed SVPs has a
legitimate interest in both the safety of its facility and the
rehabilitation of its patients.  <u>Rivera</u>, 224 Fed. Appx. at 151
(citing <u>Waterman v. Farmer</u>, 183 F.3d 208, 215 (3d Cir.
1999)("[I]t is beyond dispute that New Jersey has a legitimate
penological interest in rehabilitating its most dangerous and
compulsive sex offenders.")).  Specifically, the court upheld as
constitutional the STU's policy that allows staff to open
packages not marked as "legal mail" to assure that the packages
do not contain contraband (<u>i.e.</u>, items either harmful to staff
and residents, or detrimental to rehabilitation).  The court
found that plaintiff was free to send and receive mail so long as
the content of his mail was not sexually explicit.  Moreover, the
Third Circuit found no error in the district court's conclusion
that there were no ready alternatives to mail security and that

24

the STU's policy appeared to be the only viable alternative, thus supporting the reasonableness of the mail policy. Rivera, 224 Fed. Appx. at 151.

Here, this Court likewise finds that it is beyond dispute that the staff at EJSP, where plaintiff and other SVP residents are newly housed, has a legitimate interest in both the safety of its facility and rehabilitating its patients. As noted above, these civilly committed persons are convicted sexual predators, which makes safety at EJSP a very important concern. The staff clearly must determine if any items coming through the mail pose a threat to the safety of the staff or the other residents. They also must decide if any of the materials passing through the mail could be detrimental to a resident's therapy. Consequently, as set forth by the Supreme Court and the Third Circuit, the Court must defer to the prison officials when it comes to issues of managing a safe and operational prison facility. In this case, delivery of letters and packages at the Avenel facility located close by, where the staff is trained with respect to SVP issues unlike the general NJDOC staff at EJSP, assures that harmful materials are not being passed through the mail, but also allows for specialized treatment regarding SVP residents. This new policy, which appears to be preliminarily instituted because of the recent transfer of the SVP residents to EJSP, clearly bears a rational relationship to both interests discussed above. Moreover, in his interference with the mail claim, Graham does

not allege a single incident where his mail has not been delivered or received.[12]  Rather, his only complaint seems to be that his mail is being sent to another facility instead of EJSP where he now resides.  Graham does not articulate a claim that prison officials are intentionally delaying his mail.  He clearly admits that he is free to use and receive mail and packages in general.  Therefore, the Court will dismiss this claim without prejudice at this time, and allow Graham to file an amended pleading, consistent with the pleading requirements of Rule 8(a)(2) and amended pleading requirements of Rule 15 of the Federal Rules of Civil Procedure, as discussed in fn. 10 of this Opinion, <u>supra</u>, if Graham in fact wishes to pursue such a claim.

D.    <u>Deprivation of Property Claim</u>

Graham also appears to be asserting a claim that he has been deprived of his personal property in violation of his constitutional rights.

The Fourteenth Amendment provides, in pertinent part here, that the State may not "deprive any person of life, liberty, or property, without due process of law[.]"  The "due process of law" essentially requires that the government provide a person notice and opportunity to be heard in connection with the deprivation of life, liberty or property.  <u>Zappan v. Pennsylvania</u>

---

[12]  A single interference with the delivery of an inmate's personal mail, without more, does not rise to the level of a constitutional deprivation.  <u>Morgan v. Montayne</u>, 516 F.2d 1367 (2d Cir. 1975), <u>cert</u>. <u>denied</u>, 424 U.S. 973 (1976).

Board of Probation and Parole, 152 Fed. Appx. 211, 220 (3d Cir. 2005)("The essential requirements of any procedural due process claim are notice and the opportunity to be heard."). Hence, to establish a prima facie case of a procedural due process violation, a plaintiff must establish: (1) a deprivation of a constitutionally protected liberty or property interest, (2) state action, and (3) constitutionally inadequate process. See Rusnak v. Williams, 44 Fed. Appx. 555, 558 (3d Cir. 2002) ("Procedural due process claims, to be valid, must allege state sponsored-deprivation of a protected interest in life, liberty or property. If such an interest has been or will be deprived, procedural due process requires that the governmental unit provide the individual with notice and a reasonable opportunity to be heard.")(citation omitted).

To have a property interest, Graham must demonstrate "more than an abstract need or desire for it. ... He must, instead, have a legitimate claim of entitlement to it" under state or federal law. Board of Regents v. Roth, 408 U.S. 564, 577 (1972). For present purposes, a procedural due process analysis involves a two step inquiry: the first question to be asked is whether the complaining party has a protected liberty or property interest within the contemplation of the Due Process clause of which he has been deprived and, if so, the second question is whether the process afforded the complaining party to deprive him of that

interest comported with constitutional requirements.  Shoats v. Horn, 213 F.3d 140, 143 (3d Cir. 2000).

Here, Graham fails to specify what property the NJDOC and NJDHS officials did not permit him to keep.  Moreover, he admits that the residents were given a box to pack their belongings, and were told that anything that did not fit could be sent home or thrown away.  Consequently, there is no real loss of property demonstrated.

Indeed, the limitations placed by NJDOC and NJDHS officials on personal belongings to be moved with the transfer of the residents from the Kearny facility to EJSP were neither arbitrary or capricious, but plainly were implemented in order to address the logistics of the move and to further a legitimate goal of maintaining a safe and organized mass transfer of SVPs from one facility to another.  In this regard, Graham simply has not demonstrated a constitutionally-recognized property interest in the continued possession of unrestricted personal property necessary to satisfy the threshold requirement of a deprivation of property interest.  See Semler v. Ludeman, 2010 WL 145275, *25 (D. Minn. Jan. 8, 2010).

Furthermore, to the extent that Graham was deprived of personal property as a result of the transfer to EJSP, he has a post-deprivation remedy.  Property loss caused by the intentional acts of government officials does not give rise to a procedural due process claim under § 1983 where a post-deprivation remedy

28

satisfying minimum procedural due process requirements is available under state law.  See Parratt v. Taylor, 451 U.S. 527 (1981) (overruled in part on other grounds by Daniels v. Williams, 474 U.S. 327 (1986)); see also Zinermon v. Burch, 494 U.S. 113, 115 (1990); Hudson v. Palmer, 468 U.S. 517 (1984); Holman, 712 F.2d at 856.[13]  The New Jersey Tort Claims Act ("NJTCA"), N.J. STAT. ANN. § 59:1-1 et seq., provides a post-deprivation judicial remedy to persons who believe they were deprived of property at the hands of the State or local government.  See  Holman, 712 F.2d at 857; Asquith v. Volunteers of America, 1 F. Supp.2d 405, 419 (D.N.J. 1998), aff'd 186 F.3d 407 (3d Cir. 1999).

Therefore, any deprivation of property claim asserted by Graham here will be dismissed with prejudice for failure to state a claim, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).

E.   Pat-Search and Finger-Scan Claim

Graham alleges that he was subjected to a pat-search and finger scan (Ion search) as he was coming in from the yard on May 27, 2010.  It would appear that plaintiff is asserting that as a

---

[13]   In Logan v. Zimmerman Brush Co., 455 U.S. 422 (1982), the Supreme Court explained, however, that post-deprivation remedies do not satisfy the Due Process Clause if the deprivation of property is accomplished pursuant to established state procedure rather than through random, unauthorized action.  455 U.S. at 435-36.  But see Tillman v. Lebanon Co. Correctional Facility, 221 F.3d 410, 421 n.12 (3d. Cir. 2000)(citing United States v. James Daneil Good Real Property, 510 U.S. 43, 53 (1993))(in "extraordinary situations" such as routine deduction of fees from a prisoner's account even without authorization, post-deprivation remedies may be adequate).

civilly committed person, such searches are unconstitutional and violate his rights under the Fourth Amendment.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures." U.S. CONST. amend. IV. Reasonableness under the Fourth Amendment "depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 618 (1988)(quoting United States v. Montoya de Hernandez, 473 U.S. 531, 537 (1985)). "Thus, the permissibility of a particular practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." Id. at 619 (quotation marks and internal citation omitted).

In Hudson v. Palmer, 468 U.S. 517, 530 (1984), a prisoner argued that a cell search conducted to harass him was unreasonable because a prisoner has a reasonable expectation of privacy not to have his cell, locker, personal effects, person invaded for such a purpose. Id. at 529. The Supreme Court rejected the claim because "prisoners have no legitimate expectation of privacy." Id. at 530. The Court observed that:

> A right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order.... [S]ociety would insist that the prisoner's expectation of privacy always yield to what must be considered the paramount interest in institutional security.... [I]t is accepted by

our society that loss of freedom of choice and privacy are inherent incidents of confinement.

Id. at 527-28 (footnotes, citations and internal quotation marks omitted). The same conclusion was reached with respect to pretrial detainees other than convicted prisoners. See Bell v. Wolfish, 441 U.S. 520, 558-560 (1979)(finding that a body cavity searches of pretrial detainees do not violate the Fourth Amendment).[14]

Consequently, involuntarily committed patients and SVPs, like pretrial detainees, are entitled to some protection under the Fourth Amendment, but they do not have an expectation of privacy equal to an individual in society generally. See Serna v. Goodno, 567 F.3d 944, 948 (8th Cir. 2009)(noting that pretrial detainees are kept in custody because there is cause to believe they are dangerous; similarly, commitment under Minnesota law as a sexually dangerous person requires a finding of dangerousness), cert. denied, 130 S.Ct. 465 (2009); Allison v. Snyder, 332 F.3d 1076-79 (7th Cir. 2003)(SVPs may be subjected to conditions that

---

[14] In Bell v. Wolfish, the United States Supreme Court, in determining the constitutionality of post-visitation body cavity searches, held that a reasonableness test should be employed when examining the constitutionality of a search that encroaches upon the personal privacy of an inmate and the integrity of the inmate's body. In other words, courts must balance the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted. 441 U.S. 520, 559 (1979); see also Turner v. Safley, 482 U.S. 78 (1987) (a prison regulation which infringes upon an inmate's constitutionally recognized right is valid only if it is reasonably related to a legitimate penological interest).

advance goals such as preventing escape and assuring the safety of others, even though they may not technically be "punished"), cert. denied, 540 U.S. 985 (2003); Aiken v. Nixon, 236 F. Supp.2d 211, 233 (N.D.N.Y. 2002), aff'd 80 Fed. Appx. 146 (2d Cir. 2003); see also, Jennings v. New York State Office of Mental Health, 786 F. Supp. 376, 382, 384 (S.D.N.Y. 1992), aff'd, 977 F.2d 731 (2d Cir. 1992).

Similarly, the United States Court of Appeals for the Ninth Circuit has held that, because SVPs have been civilly committed subsequent to criminal convictions and have been adjudged to pose a danger to the health and safety of others, they are subject to "[l]egitimate, non-punitive government interests" such as "maintaining jail security, and effective management of [the] detention facility." Jones v. Blanas, 393 F.3d 918, 932 (9th Cir. 2004).  Thus, the reasonableness of a particular search or seizure is determined by reference to the detention context and is a fact-intensive inquiry.  Id.

Here, with respect to his Fourth Amendment claim, Graham's primary argument appears to be that any prison actions that did not specifically take into account his classification as a SVP is per se a constitutional violation.  Applying the balancing test employed by Wolfish, this Court finds that the manner and place in which Graham was pat-searched and finger-scanned were plainly reasonable and did not violate Graham's Fourth Amendment rights. First, the pat search and finger scan were conducted when Graham

was returning from the prison yard and before he could return to his living quarters.  See Semler v. Ludeman, 2010 WL 145275, *19, D. Minn. Jan. 8, 2010)(finding no Fourth Amendment violation where plaintiffs were required to submit to pat searches following gym use and kitchen work assignments that included removal of socks and shoes, opening their mouths, showing their zippers, showing behind their ears and running their fingers through their hair; search was "not highly intrusive" and was "not unlike the scope of searches of the general public at airport security checkpoints).  See also Serna, 567 F.3d at 955-56 (upholding reasonableness of a facility-wide visual body cavity search after a cell phone case (cell phones considered contraband) was found, because, while invasive, the searches were conducted privately, safely, and professionally, and the facility was reacting to a recurring problem involving contraband cell phones.

Moreover, there are no allegations that the guards conducted the search in a menacing or degrading manner.  Graham does not allege that there was physical force used or that the search was observed by any other SVP patients or by staff members of the opposite sex.  Graham also does not allege that the search was done in a menacing manner.  See Kitchens v. Mims, 2010 WL 1240980 (E.D.Cal. March 25, 2010).

Therefore, based on all of these factors, this Court will dismiss Graham's Fourth Amendment unlawful search claim, pursuant

to 28 U.S.C. § 1915(e)(2)(B)(ii), for failure to state a cognizable claim under § 1983.

F.   Interruption of Treatment Claim

Finally, Graham appears to assert that therapy/treatment sessions have been denied because of the transfer to EJSP.  He contends that he has been denied the right to adequate treatment and reasonable care applicable to civilly committed SVPs, in violation of the Fourteenth Amendment.

The Fourteenth Amendment guarantees that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law."  This due process guarantee has been interpreted to have both procedural and substantive components, the latter which protects fundamental rights that are so "implicit in the concept of ordered liberty" that "neither liberty nor justice would exist if they were sacrificed."  Palko v. Conn., 302 U.S. 319, 325 (1937).  These fundamental rights include those guaranteed by the Bill of Rights, as well as certain liberty and privacy interests implicitly protected by the Due Process Clause, such as the right to marry.  Washington v. Glucksberg, 521 U.S. 702, 720 (1997).  Substantive due process also protects against government conduct that is so egregious that it "shocks the conscience," even where the conduct does not implicate any specific fundamental right.  See United States v. Salerno, 481 U.S. 739, 746 (1987).

34

Laws disturbing fundamental rights receive strict scrutiny and will be upheld if they are "narrowly tailored to serve a compelling state interest." <u>Reno v. Flores</u>, 507 U.S. 292, 302 (1993).  However, regulations not implicating fundamental rights (in other words, those claims attacking particularly egregious or arbitrary governmental actions) are analyzed under the deferential standard referred to as the rational basis review, and will generally succeed only if the government action shocks the conscience.  <u>See</u> <u>Glucksberg</u>, 521 U.S. at 728.

With respect to Graham's claim, it appears that he is asserting that he has a fundamental right to adequate treatment as a civilly committed sex offender.  The Supreme Court established that there exists a constitutionally protected right of mentally retarded persons confined at a state institution to minimally adequate treatment.  Specifically, the Supreme Court held that there is a constitutional right of mentally disabled persons confined at a state institution to "minimally adequate habilitation", self-care treatment or training to the extent necessary to protect their recognized fundamental rights to safety and freedom from physical restraints.  <u>Youngberg</u>, 457 U.S. at 316, 319 and 322.

The Supreme Court further held that, where a fundamental right is at issue, a district court must balance "the liberty of the individual and the demands of an organized society" to determine whether such right has been violated.  <u>Youngberg</u>, 457 U.S. at 320.  Although restrictions burdening a fundamental right

generally receive strict scrutiny, in <u>Youngberg</u>, the Supreme
Court found that this sort of rigorous analysis would unduly
burden the ability of states, specifically their professional
employees, to administer mental health institutions.  <u>Id</u>. at 322.
Consequently, the Court concluded that "the Constitution only
requires that the courts make certain that professional judgment
was in fact exercised," because "[i]t is not appropriate for the
courts to specify which of several professionally acceptable
choices should have been made."  <u>Id</u>. at 321 (internal quotation
and citation omitted).  Thus, a decision, "if made by a
professional, is presumptively valid; liability may be imposed
only when the decision by the professional is such a substantial
departure from accepted professional judgment, practice, or
standards as to demonstrate that the person responsible actually
did not base the decision on such judgment."  <u>Id</u>. at 323.

In <u>Leamer v. Fauver</u>, 288 F.3d 532 (3d Cir. 2002), the United
States Court of Appeals for the Third Circuit held that New
Jersey's unique former statutory scheme for sex offenders that
predicated the term of sentence on a prisoner's response to
treatment and created a right to treatment created a fundamental
and cognizable liberty interest in treatment, for purposes of
both procedural and substantive due process analyses.  288 F.3d
at 545.  Leamer was not a civilly committed sex offender like
plaintiff here.  Rather, Leamer was a convicted sex offender
whose confinement and treatment were inextricably linked pursuant
to statute.  The sentencing court had classified Leamer as having

a "mental aberration" and in need of "specialized treatment," which automatically subjected Leamer to the maximum incarceration permitted by law unless he is cured prior to that point.  Leamer could not reduce his sentence through good behavior credits, parole policies or other credits.  Instead, he could only shorten his incarceration through successful therapy, which was an "inherent and integral element" of the statutory scheme.  Consequently, the Third Circuit found that deprivation of treatment would be a grievous loss not emanating from the sentence.  Leamer, 288 F.3d at 544.

Apart from that recognized in Youngberg to prevent the violation of recognized fundamental rights to safety and freedom from physical restraints, this Court finds the Third Circuit's holding in Leamer to clearly extend to an involuntarily committed sex offender under New Jersey's SVPA.  Like Leamer, the length of Graham's confinement under the SVPA is predicated on his response to treatment.  Indeed, the provisions of the SVPA explicitly recognize New Jersey's obligation to provide treatment to SVPs for their eventual release based on successful therapy.  See N.J.S.A. 30:4-27.32(a)("If the court finds by clear and convincing evidence that the person needs continued involuntary commitment as a sexually violent predator, it shall issue an order authorizing the involuntary commitment of the person to a facility designated for the custody, care and **treatment** of sexually violent predators")(emphasis added); N.J.S.A. 30:4-34(b)("The Division of Mental Health Services in the Department

of Human Services shall provide or arrange for treatment for a
person committed pursuant to this act.  Such treatment shall be
appropriately tailored to address the specific needs of sexually
violent predators."); N.J.S.A. 30:4-27.36(a)(At any time during
the involuntary commitment of a person under this act, if the
person's treatment team determines that the person's mental
condition has so changed that the person is not likely to engage
in acts of sexual violence if released, the treatment team shall
recommend that the Department of Human Services authorize the
person to petition the court for discharge from involuntary
commitment status"); see also Kansas v. Hendricks, 521 U.S. 346,
367 (1997)(concluding from similarly-worded provisions of Kansas
SVP Act that "the State has a statutory obligation to provide
'care and treatment for [persons adjudged sexually dangerous]
designed to effect recovery ....")(alterations in
original)(internal citations omitted).

Therefore, based on Youngberg and Leamer, this Court
concludes that Graham's liberty interest in treatment is
fundamental and cognizable for purposes of both procedural and
substantive due process analyses.  But see Bailey v. Gardebring,
940 F.2d 1150, 1154 (8th Cir. 1991), cert. denied, 503 U.S. 952
(1992)(where the Eighth Circuit noted that Youngberg did not
establish a right for the civilly committed to treatment per se;
the Supreme Court only "held that the Constitution required only
such 'minimally adequate training ... as may be reasonable in
light of [the] liberty interest[ ] in safety and freedom from

unreasonable restraints.'")(quoting Youngberg, 457 U.S. at 322).
In Bailey, the Eighth Circuit concluded that plaintiff had no
right to "psychiatric treatment to overcome a 'sexual offender
condition'" because he "was neither in danger during his civil
commitment nor was he subject to any restraints beyond the
ordinary incidents of any involuntary confinement." Id. at 1153,
1154. Citing Bailey, district courts in the Eighth Circuit have
since concluded that civilly committed sexual predators have no
substantive due process right to mental health treatment,
adequate or otherwise. See Semler v. Ludeman, 2010 WL 145275, at
*26 (D. Minn. Jan. 8, 2010)("Because this Court has not
recognized a constitutional right to effective 'treatment' in the
context of civilly committed sex offenders, Plaintiffs [alleging
substantive due process violations through ineffective treatment]
have failed to allege a due process claim ....")(citing
Nicolaison v. Ludeman, 2008 WL 508549, at *8 (D. Minn. Feb. 11,
2008)(finding, in ultimately concluding that involuntarily
committed sex offender's right to treatment is not "clearly
established" for purposes of 28 U.S.C. § 2254(d)(1), that
Youngberg "only recognized a right to 'minimally adequate'
treatment that reduces the need for restraints," and not a
"comparable right to treatment that facilitates release")).

Nevertheless, while this Court may recognize that Graham has
a fundamental and cognizable liberty interest in treatment, based
on the allegations and admissions by plaintiff in his Complaint

and addendums, this Court also determines that there has been no procedural or substantive due process violations at this time.

With respect to Graham's right to procedural due process, there does not appear to be any basis to plaintiff's claim that there has been a categorical denial of therapy due to his transfer to EJSP's administrative segregation unit.  In <u>Leamer</u>, the Third Circuit, relying on <u>Sandin</u>, found that Leamer would face "significant obstacles" in establishing a procedural due process claim based on his placement on RAP (restricted activities program) status because the mere fact of placement in administrative segregation is not in and of itself enough to implicate a liberty interest.  <u>Leamer</u>, 288 F.3d at 546.  In the instant case, Graham is not actually confined in administrative segregation for the purpose of punishment, but rather, he and the other SVP residents at the Kearny facility were transferred to a unit at EJSP separate and apart from the convicted prisoners.  Moreover, as explained below, Graham admits that he has received therapy since his arrival at EJSP.

This Court likewise finds no substantive due process violation at this time.  Substantive due process prevents the government from engaging in conduct that "shocks the conscience," or interferes with rights "implicit in the concept of ordered liberty."  <u>Glucksberg</u>, 521 U.S. at 721.  Under this standard, Defendants' actions in denying Graham his statutory right to treatment will be found unconstitutional under the Fourteenth Amendment if they were so arbitrary or egregious as to shock the

conscience.  See Leamer, 288 F.3d at 546-47 (substantive due process claim alleging inadequate treatment for committed sex offender "must focus on the challenged abuse of power by officials in denying [the plaintiff] the treatment regimen that was statutorily mandated and was necessary in order for his condition to improve, and thus for him to advance toward release")

Here, despite Graham's initial allegation, defendants have not categorically declined to provide any mental health treatment to the SVP residents at EJSP, but only projected a short period for disruption of treatment so as to accomplish the transfer and/or renovation of the segregated nit at EJSP.  Thus, this Court cannot readily conclude that Defendants' actions were conscience-shocking and in violation of Graham's substantive due process rights.  Indeed, plaintiff admits that therapy sessions were resumed only days after he was moved to EJSP, but that he cannot "focus" because of the prison environment.

Thus, based on Graham's admission that treatment has been offered, the Court concludes that the treatment has been made available at EJSP and there is no demonstrated interruption of adequate treatment that would rise to the level of a constitutional due process deprivation as alleged.  Any deviation in providing treatment was merely temporary to accomplish the transfer and renovate the SVP quarters at EJSP.  Therefore, this Court concludes that the short-lived disruption of therapy and

treatment was not so egregious as to render mental treatment at EJSP conscience-shockingly deficient.

Accordingly, Graham's claim alleging inadequate treatment will be dismissed without prejudice for failure to state a cognizable claim of a deprivation of a constitutional right at this time.

V.   <u>CONCLUSION</u>

For the reasons set forth above, plaintiff's Complaint will be dismissed without prejudice, in its entirety as against all named defendants, for failure to state a claim at this time, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).  Plaintiff may seek leave to re-open this case to file an amended pleading to cure the deficiencies noted herein.  An appropriate order follows.


<u>/s/ Katharine S. Hayden</u>
KATHARINE S. HAYDEN
United States District Judge

Dated:    10/18/10